**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| TASKTOP TECHNOLOGIES US INC.,      ) | |
|         ) | |
| *Plaintiff,*      ) | |
|         ) | |
| v.      ) | Civ. No. 18-1075-RGA |
|         ) | |
|         ) | |
| JOHNATHAN MCGOWAN,      ) | |
|         ) | |
| *Defendant.*      ) | |

## MEMORANDUM

This action arises from employer Tasktop Technologies U.S. Inc. seeking to enforce its employment agreement and enjoin former employee Johnathan McGowan from working with Tasktop's competitors. Tasktop alleges that McGowan misappropriated Tasktop's confidential information and used it to compete against Tasktop when he left Tasktop and started working for its competitors. Presently before the Court is Tasktop's Motion for a Preliminary Injunction ("PI") against McGowan. (D.I. 3) For the reasons set forth below, Tasktop's Motion will be denied.

### I. BACKGROUND

#### A. McGowan's Employment with Tasktop

Tasktop is a Delaware corporation headquartered in Texas. (D.I. 18 ¶ 3) According to the verified amended complaint, it "develops and provides software products, resources, training, solutions, and software deployment services to clients across many industries all over the world, including the United States, the United Kingdom, Germany, Canada, Sweden, and Latvia." (*Id.* ¶ 9) It "helps its clients implement their most critical enterprise software solutions using its

1

proprietary software products and tools" and "provides unique customization services for client's networks and environments." (*Id.* ¶¶ 9, 10)

McGowan is a Georgia resident who was employed with Tasktop for about two years, from March 14, 2016 until March 30, 2018. (*Id.* ¶ 4, 17) He worked primarily from his home in Georgia, traveling to other States when required. (D.I. 61 at 8) He was initially hired as a Solutions Consultant and was later promoted to Senior Solutions Consultant in Tasktop's Professional Services group. (D.I. 18 ¶ 17; *see also* D.I. 61-1 Ex. 1 at pp. 2-3 of 256 ("Offer Letter")) He accepted an at-will employment with a base annual salary of $40,000, a bonus not exceeding $10,000 annually tied to meeting certain quarterly metrics, and an equity compensation (options to purchase 40,000 shares of Tasktop vesting over 4 years), among other benefits such as a corporate cell phone plan and a company issued laptop. (*See* Offer Letter) Tasktop periodically increased his base salary. (D.I. 62, Ex. 4 ($48,000 effective Oct. 1, 2016); *id.* Ex. 5 ($60,000 effective Oct. 1, 2017); *id.* Ex. 6 ($85,000 effective Apr. 1, 2018 as Senior Solutions Consultant)

Tasktop provided a detailed description of the roles, responsibilities, and requirements of a Solution Consultant.[1] (*See* D.I. 61-2 Ex. 5 at pp. 2-3 of 182) In its description, it explained that to "[j]oin the Tasktop Team as a Solution Consultant" is to "become a key contributor in our Professional Services team helping enterprises integrate their information systems using Tasktop products and services." (*Id.* at p. 2 of 182) A reasonable inference based on this description is that McGowan was hired to help Tasktop implement its software products and services to its customers. But his exact role in the two years he had worked at Tasktop is the subject of vigorous dispute between the parties. (*See* D.I. 68 at 4-5) (McGowan noting that his position was merely

---

[1] Tasktop's documents refer to McGowan's position at Tasktop as either a "Solutions Consultant" or a "Solution Consultant."

entry-level, his "primary role was to deploy Tasktop software," and he "was not involved in sales or soliciting customers"); D.I. 72 at 1-2 (Tasktop noting McGowan's position was not just entry-level and "[he] was the highest person in his position on key Tasktop deployments")

Regardless, it is undisputed that McGowan was hired despite lacking the minimum experience Tasktop required for a Solution Consultant. This included a "[m]inimum 5 years of solid experience in software implementations and customer engagements." (D.I. 61-2 Ex. 5 at p. 3 of 182) McGowan notes he was a stay-at-home father from around 2007 through mid-2015. (D.I. 68 at 3) He had gone back to college and graduated with a degree in computer science in December 2015 before joining Tasktop in 2016. (*See* D.I. 61-2 Ex. 6 at pp. 5-6 of 182 ("Resume")) Based on his Resume, he had studied music in his first stint in college, which likely occurred about fifteen years ago, based on his participation in study abroad program in Summer 2003. (*See* Resume) The only work experience listed in his Resume in the software field before joining Tasktop was as a "Computer Science/Technical Writing Intern" in 2015; the Resume also lists some software related projects he had done during college in 2014 and 2015. (*See id.*)

### B. McGowan's Employee Invention, Non-Disclosure, Non-Competition and Non-Solicitation Agreement with Tasktop

Tasktop's offer for employment was conditioned on McGowan entering into an "Employee Invention, Non-Disclosure, Non-Competition and Non-Solicitation Agreement" ("Agreement"). (*See* Offer Letter) This Agreement itself was not included in the original offer. (*See id.*) The Offer Letter was dated February 25, 2016, and McGowan had until March 1, 2016, to accept the offer. (*Id.*) Tasktop did not send him a copy of the Agreement until March 7, 2016. (D.I. 62 ¶ 9) A reasonable inference based on this timeline is that McGowan accepted the offer before he received the Agreement. He started working for Tasktop on March 14, 2016. (*Id.*)

Certain provisions – "Proprietary Information" and "Non-Compete/Non-Solicitation" – of the Agreement are especially pertinent to the dispute here. Under the terms of the Agreement, McGowan agreed to maintain the confidentiality of Tasktop's business-sensitive information and not to use such information against Tasktop's business interests. Specifically, he agreed to keep Tasktop's confidential, proprietary, and trade secret information confidential, not to disclose them to any third party, and not to use them for any purpose whatsoever except in the course and scope of his employment at Tasktop. (*See* 62-1 Ex. 3 at pp. 15-16 of 40) He also agreed not to accept employment with a "Competitive Business," as defined under the Agreement, and not to solicit business from or to perform work for any of Tasktop's past or present clients, or prospective clients under certain conditions, for twelve months after the termination of his employment with Tasktop. (*See id.* at pp. 17-18 of 40)

The Agreement defines "Competitive Business" very broadly, without specifying any limits on specific kinds of task management or project management software, and any limits on geography. (*See id.* at p. 17) "Competitive Business" includes "[a]ny business, organization or person that develops, markets, distributes, or sells" anywhere in the world "[certain software tools] . . . includ[ing] build management, source code management, project portfolio management, continuous integration functionality and issue tracking software," "any task-focused collaboration software, application or tool or any task management integration or project management integration software, application or tool;" or "*any task management or project management software, application or tool*." (*Id.*; emphasis added)

### C. McGowan's Departure from Tasktop

McGowan submitted a letter of resignation, informing Tasktop that he was leaving his position at the end of March 2018 because he had "received and – after careful consideration –

4

accepted an offer from another company." (D.I. 62-1 Ex. 7) Tasktop acknowledged his letter of resignation and reminded him of his continued obligations under the Agreement, including the confidentiality and non-compete provisions. (*See id.* Ex. 8)

While McGowan did not specify the identity of the company from which he had accepted a job offer, Tasktop believed he left to work for The Go to Group, Inc. ("GTG"), taking on a similar role to the one he had at Tasktop. (D.I. 18 ¶ 30) Later – after this action commenced – GTG confirmed that McGowan began working for GTG on April 1, 2018. (D.I. 20-1 ¶ 2) Tasktop alleges that GTG is its direct competitor, "often compet[ing] side by side for the same clients and business opportunities and provide competing software products, implementation tools, related services, training and support." (D.I. 18 ¶ 12)

McGowan's employment with GTG lasted only three months, until June 30, 2018. (D.I. 20-1 ¶ 2) He left GTG to join ConnectALL, LLC, which was a formed as a spin-off business from GTG. (*Id.* ¶¶ 3-4) McGowan was one of several GTG employees who left GTG and joined ConnectALL. (*Id.* ¶ 5) According to GTG, its "continuing relationship with ConnectALL, LLC going forward has not been finalized and the terms of that relationship and ConnectALL, LLC's ownership are still being determined." (*Id.* ¶ 6)

**D. Procedural History**

Tasktop initiated this lawsuit by filing a verified complaint and simultaneously filing a motion for a PI, or in the alternative, a temporary restraining order ("TRO"), to enjoin McGowan and another defendant, GTG, from breaching the Agreement. (D.I. 1, 3, 4) Having received Tasktop's request for an urgent hearing on the matter (*see* D.I. 3-1), the Court ordered expedited briefing and oral argument (*see* D.I. 5, 14), which the Court held soon after the filing of the initial

complaint (*see* D.I. 22 ("Tr.")).  Tasktop subsequently filed a verified amended complaint.  (D.I. 18)

At the Court's request for some clarification regarding McGowan's current employment status before oral argument, GTG submitted a statement under oath from its President stating that McGowan was no longer employed at GTG and is currently employed at ConnectALL, which GTG explained is a spin-off business from GTG.[2]  (*See* D.I. 20-1)  Towards the end of the hearing, the Court denied Tasktop's request for a TRO and allowed limited discovery[3] and further briefing on its request for an immediate PI, which was denied without prejudice.  (*See* Tr. at 47, 57; *see also* D.I. 26, 27)  Once the supplemental briefing was completed (*see* D.I. 61, 68, 72), the Court heard another oral argument related to the PI motion.  (*See* D.I. 91)  Thereafter, the parties submitted additional materials, as requested during the hearing.  (*See* D.I. 77, 78, 83, 84)

## II.    DISCUSSION

Tasktop seeks a preliminary injunction on the grounds that McGowan's employment with GTG and ConnectALL violated the terms of the confidentiality provision and non-compete/non-solicitation provision in the Agreement.  (*See* D.I. 61 at 12-14)  McGowan challenges the Agreement's enforceability as well as its application to him.[4]  (*See* D.I. 68 at 1, 2-3, 7-9)

---

[2] Later, Tasktop voluntarily dismissed GTG from this case.  (D.I. 67)

[3] While collecting documents from McGowan for discovery purposes, it became apparent to McGowan's counsel that "a handful of documents were altered to avoid being produced." (D.I. 50 at 1; *see also* D.I. 54)

[4] McGowan also contends that the Court lacks personal jurisdiction and Delaware is not a convenient forum to litigate this case.  (D.I. 68 at 2, 10-14)  These are not frivolous issues, but they are also not well developed in the briefing.  Tasktop relies upon consent to jurisdiction (*see* D.I. 72 at 9), but the Employment Agreement is not very clear that it is designating Delaware as a forum.  The "Governing Law" is clearly stated to be Delaware's.  (D.I. 62-1, Ex. 2 ¶ 12(f) at p. 9 of 40)  However, the designation of Delaware as a forum is less clear, as there is no mention of consent to jurisdiction in Delaware courts.  *See id.* ("Each [party] . . . consents to the exercise of jurisdiction over it . . . with respect to any action, suit, or proceeding arising out of or in connection with this Agreement.")  The Verified Amended Complaint points to other bases for personal

## A. Injunction Standard

"A preliminary injunction is an extraordinary remedy that should be granted only if (1) the plaintiff is likely to succeed on the merits; (2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant; and (4) granting the injunction is in the public interest." *NutraSweet Co. v. Vit-Mar Enterprises, Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) (internal citation omitted). "[F]ailure to establish any element in [a plaintiff's] favor renders a preliminary injunction inappropriate." *Id.* Only if the movant produces evidence sufficient that all four factors favor preliminary relief should the injunction issue. *See Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990). The court will address each of these factors in turn.

**Success on the Merits.** Tasktop alleges that McGowan breached the Agreement by working at GTG and ConnectALL, which are both Tasktop's competitors, misappropriated Tasktop's proprietary methodologies, and destroyed and altered documents.[5] (*See* D.I. 61 at 12-14) McGowan counters by challenging the Agreement's enforceability as well as its application to him. (*See generally* D.I. 68)

Tasktop has provided substantial evidence that McGowan breached the non-compete provision of the Agreement by starting to work for GTG and ConnectALL.[6] Under the "Non-

---

jurisdiction, which the Court believes is sufficient for this stage of the proceedings. (*See* D.I. 18 ¶ 7) For the purposes of the motion, the Court will assume this Court is a convenient forum.

[5] McGowan's conduct during discovery (*see* D.I. 49, 54), while it is troubling and challenges his credibility, does not warrant the "extraordinary remedy" sought by Tasktop. *NutraSweet*, 176 F.3d at 153.

[6] As to the confidentiality provision and the non-solicitation provision, there are disputed factual issues that the Court cannot address at this stage. *See Transilwrap Co., Inc. v. Metal FX Films, LLC*, 2014 WL 12597638, at *1 (D.N.J. Oct. 23, 2014) ("[A] preliminary injunction may not be issued where there are disputed issues of fact."); *see also Noorhasan v. de Jongh*, 2012 WL 1153285, at *4 (D.V.I. Mar. 31, 2012) (collecting cases). With respect to the confidentiality provision, the parties have offered contradictory information regarding whether the confidentiality

Compete/Non-Solicitation" provision of the Agreement, McGowan agreed that "[he] will not without the written consent of [Tasktop] . . . engage in, participate in, or assist, as . . . employee, any Competitive Business (as defined below)" for twelve months after he left Tasktop. (D.I. 62-1 at p. 17 of 40) McGowan does not dispute that GTG and ConnectALL are competitors of Tasktop, as defined in the Agreement. (*See* D.I. 72 Ex. 2 at 118-19 (McGowan agreeing during deposition that GTG and ConnectALL fall under definition of Competitive Business)) Nor has McGowan offered any evidence to show that the exceptions outlined in Section 4(d) are applicable here (*see* 62-1 Ex. 3 at pp. 17-18 of 40), or that he obtained the written consent of Tasktop before starting his employment at GTG or ConnectALL, as the Agreement required.

Because McGowan has failed to rebut Tasktop's substantial evidence of breach of the non-compete provision of the Agreement, the only issue to address with respect to Tasktop's likelihood of success is whether the Agreement is enforceable under Delaware law.

"In order to assess the probability of success on the merits, this Court must determine (a) the applicability of Delaware law to this dispute, (b) whether the restrictive covenants have lapsed,[7] and (c) whether the restrictive covenants contained in the . . . Agreement are enforceable." *Sensus*

___

provision was breached. Tasktop has offered evidence showing the information McGowan misappropriated and shared with its competitors are confidential and proprietary Tasktop information, which are not publicly available (*see* D.I. 61 at 12-13; D.I. 84 at 3-8), while McGowan points to deposition testimony and website links showing the information at issue all are publicly available and not confidential or trade secret information (*see* D.I. 68 at 7-8; D.I. 78). With respect to the non-solicitation provision, again both parties rely, among other things, on deposition testimony to support their respective positions. (*See* D.I. 61 at 14; D.I. 68 at 8-9; *see also* D.I. 91 at 46 (During Sep. 11, 2018 hearing, Tasktop's counsel noting "circumstances regarding [certain client] candidly a little bit cloudy . . . [and] nonsolicit is not the only covenant we're seeking to enforce, it's the noncompete")) Because the parties have raised factual disputes with respect to the confidentiality and the non-solicitation provision, the Court cannot conclude that Tasktop is likely to succeed on the merits based on the existing record on those issues.
[7] As there is no dispute about when the restrictive covenants were triggered and whether they have lapsed, the Court does not address this issue.

*USA, Inc. v. Franklin*, 2016 WL 1466488, at *2 (D. Del. Apr. 14, 2016). "The court will examine the specific factual circumstances to determine enforceability." *Id.* at *7. In *Sensus*, the Court granted a plaintiff employer's motion for a preliminary injunction to enjoin a defendant former employee from working for the employer's competitors after looking at the specific factual circumstances in that case and concluding that the employment agreement at issue there was enforceable. *Id.* at *1, *9.

McGowan argues that the Agreement is unenforceable, regardless of whether Georgia (State where McGowan resides and entered into Agreement with Tasktop) law applies or whether Delaware (State where Tasktop is incorporated) law applies.[8] (D.I. 68 at 15) Assuming Delaware law applies,[9] the Agreement is enforceable, if it "(i) adhere[s] to general principles of contract, (ii) [is] reasonable in scope and duration, (iii) advance[s] the legitimate economic interests of the party enforcing the covenant, and (iv) survive[s] a balance of the equities." *Sensus*, 2016 WL 1466488, at *7.

The Agreement is unenforceable under Delaware law. While there is no evidence the Agreement fails to adhere to general contract law requirements, this was not a contract that was entered between sophisticated parties with similar bargaining power. *See Delaware Elevator, Inc.*

---

[8] At the initial expedited hearing on Tasktop's request for a TRO, the Court believed the Agreement is governed by Delaware law. (*See generally* Tr.) Additional briefing and argument since then has not altered the Court's conclusion.

[9] If Georgia law applies, the Agreement appears even more likely to be unenforceable because it lacks a geographic area restriction. *See LifeBrite Labs., LLC v. Cooksey*, 2016 WL 7840217, at *5 (N.D. Ga. Dec. 9, 2016) ("The non-competition clause . . . does not contain a geographic limitation. Under its terms, [defendant] would be prohibited from working for any potentially competitive company anywhere in the world. Such a result is clearly unreasonable under the [Georgia] statute, rendering the non-competition clause void and unenforceable."); *ID Tech. v. Hamilton*, 2014 U.S. Dist. LEXIS 198732, at *2 (N.D. Ga. Mar. 24, 2014) ("The Court finds that the lack of a geographic area restriction renders the restrictive covenant unenforceable [under Georgia law].")

*v. Williams*, 2011 WL 1005181, at *11 (Del. Ch. Mar. 16, 2011) ("It is trite and naïve to suggest that low to mid-level employees freely agree to restrictive covenants. Disparities in resources, bargaining power, and access to information undercut that overly simplistic notion - except for senior managers and top-dog executives") McGowan was a recent computer science major reentering the workforce after a long hiatus without any experience in the software industry when he joined Tasktop as a Solutions Consultant and was paid a relatively low starting salary.[10] Under these circumstances, the Court is not persuaded that "McGowan could have attempted to negotiate the terms of the Agreement," as Tasktop suggests. (D.I. 61 at 15) Tasktop offered identical boiler-plate non-compete provisions to all of its new employees as a condition for employment. (*See* D.I. 68-1 at pp. 351-52 of 762) Moreover, McGowan had only a few days to accept the offer before it expired (*see* Offer Letter), and Tasktop did not provide a copy of the Agreement to McGowan until after he had accepted the offer. Regardless, the Agreement is unenforceable based on the three remaining factors Delaware courts consider.

The Agreement is not reasonable in scope because it lacks a geographical limitation and defines competitive businesses too broadly. *See Caras v. Am. Original Corp.*, 1987 WL 15553, at *2 (Del. Ch. July 31, 1987) ("Agreements of employees not to compete against a former employer must be closely scrutinized because they are restrictive of trade and should be enforced only to the extent that it is reasonable so to do."); *Prod. Action Int'l, Inc. v. Mero*, 277 F. Supp. 2d 919, 924 n. 2 (S.D. Ind. 2003) ("[A]n ordinary employee typically has only his own labor or skills to sell and often is not in a position to bargain with his employer. Postemployment restraints in such cases must be scrutinized carefully to see that they go no further than necessary to protect an employer's

---

[10] *See* D.I. 68 at 4 (McGowan citing to deposition transcript of Tasktop's corporate representative showing McGowan's entry-level salary was lower than any other employee at Tasktop since July 2017)

legitimate interests."). While the lack of a geographical limitation is not *per se* unreasonable, "covenants not to compete when contained in employment agreements are not mechanically enforced." *See Delaware Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at \*11-12 (Del. Ch. Oct. 23, 2002) (noting "lack of a geographical restriction may prove fatal to the enforceability of an agreement not to compete").

Unlike the agreement in *Sensus*, in which defendant was "only enjoined from competing in those locations where [plaintiffs] have conducted business prior to [defendant's] termination," the Agreement here precludes McGowan from working with Tasktop's competitors anywhere in the world for a year after leaving Tasktop. *Sensus*, 2016 WL 1466488, at \*7. The Agreement also broadly defines competitors to include "[a]ny business . . . that provides integration services or other professional services involving task management or project management software, application or tool," with limited exceptions. (*See* 62-1 Ex. 3 at p. 17-18 of 40) In other words, McGowan is prohibited from working in any company anywhere that provides these services, irrespective of whether they relate to Tasktop's past, present, or prospective clients. Given the extensive geographic area and competitive businesses encompassed by the Agreement, the Court finds the Agreement is unreasonably broad. Therefore, this factor does not favor Tasktop.

Tasktop has not sufficiently persuaded the Court that enforcing the Agreement would advance and protect Tasktop's legitimate economic interests. Courts recognize a narrow list of legitimate business interests such as "employer goodwill and protecting an employer's confidential information, including customer lists, pricing, trade secrets and proprietary information" to enforce a covenant. *Sensus*, 2016 WL 1466488, at \*7. In *Sensus*, the court concluded that the non-compete provision met this criterion because defendant was a "key employee" in a "critical position" who had "in-depth information regarding the proprietary technology," "worked on all large deals,"

"possessed a level of knowledge with the technology not many other sales staff possessed," "had knowledge regarding how [plaintiff] prices and negotiates contracts, [plaintiff's] business strategy," and had "worked on some of [plaintiff's] largest accounts." (*Id.*) By contrast, McGowan was hired fresh out of college at a relatively low level of salary with no experience in the software industry, as explained earlier. The Court is not persuaded that McGowan was a key employee in a critical position like the defendant in *Sensus*, as Tasktop contends. (*See* D.I. 61 at 5-9)

"Balancing the equities may weigh against enforcement where the interests the employer seeks to protect are ephemeral in contrast to the grave harm to the employee resulting from enforcement." *Sensus*, 2016 WL 1466488, at *8 (brackets and quotation marks omitted). Here, unlike the defendant in *Sensus*, the Court does not believe McGowan "is an experienced business professional [whose] . . . knowledge of [Tasktop's] business practices make him uniquely positioned to cause hardship" to Tasktop. (*Id.*) Moreover, the scope of the Agreement is too broad, as the Court concluded earlier. It may be unreasonable under these circumstances to expect McGowan to find employment in a non-competitive industry or in a location which does not violate the Agreement. On the other hand, Tasktop could have reasonably protected itself through less onerous restrictions in the Agreement to discourage competitors from hiring away its employees. For these reasons, the balance of equities does not favor enforcement.

**Irreparable Harm to Tasktop.** For the reasons already discussed, the Court finds no persuasive basis to conclude that Tasktop will suffer irreparable harm if McGowan is not enjoined. McGowan's level of experience and the two-year employment history with Tasktop does not support a finding of irreparable harm. Unlike the defendant in *Sensus*, the Court is not persuaded that McGowan had "in-depth knowledge" of Tasktop's business operations or was "intimately familiar" with Tasktop's proprietary information. *Sensus*, 2016 WL 1466488, at *8.

**Irreparable Harm to McGowan.** Conversely, enforcing the Agreement is likely to cause irreparable harm to McGowan. If enjoined to work for a Competitive Business, as defined in the Agreement, he may not be able to find "comparable employment with relative ease." (*Id.*) He will be restricted from working anywhere in the world in a related field. He may face the additional burden of gaining new skills or finding employment far from his current residence that does not violate the Agreement. Enforcing the Agreement could impose serious hardship on McGowan and discourage him from seeking better employment elsewhere and earning a living to support his family.

**Public Interest.** It is not in the best interest of the public to issue the injunction requested by Tasktop. The public interests at issue here are enforcing private contracts related to employment and the rights of employees to freely seek employment of their choosing in a desired field. *See Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 119 (3d Cir. 2010) In a case such as this one, however, protecting McGowan's right to seek employment outweighs the benefits of enforcing Tasktop's Agreement. This was not the kind of "agreement [that] was entered into by two competent, business-savvy parties." *Sensus*, 2016 WL 1466488, at *8. As discussed above, McGowan was far from an experienced business professional in the software field. Tasktop hired him right after he graduated from college, which he had pursued again after several years of staying out of the workforce, lacking any experience, much less the minimum (five years) work experience it required for the position, and offering him a comparatively low starting salary of $40,000. Notably, under these circumstances, he could not have bargained for favorable terms with respect to the Agreement, even if he were given the opportunity to do so, which he evidently did not get in this case. *See Del. Elevator*, 2011 WL 1005181, at *11.

It is also not in the best interest of the public to enforce an agreement requiring a relatively inexperienced and low-paid employee like McGowan who resides in Georgia to litigate 750 miles away from home. (*See id.* at \*30-31 ("Later on, if a dispute arises, the employer will be better able to fund the costs of enforcement, including litigation . . . [and] departing employee faces not only the costs of litigation [in a distant State], but the difficulties the non-compete creates for a new employer who could be brought into the dispute."))

III. **CONCLUSION**

For the foregoing reasons, the Court will deny Tasktop's Motion for a Preliminary Injunction.

An appropriate order will be entered.

Dated: October ⎸⎸ , 2018

_____
UNITED STATES DISTRICT JUDGE